# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **CRIMINAL NO. PWG-17-304** |
| **PEDRO JOSE ORDOÑEZ,** | * | |
| **Defendant** | * | |

**\* \* \* \* \* \***

## MEMORANDUM OPINION AND ORDER

Pedro Jose Ordoñez is facing trial for illegal reentry into the United States after prior removal,[1] in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Indictment, ECF No. 1. If convicted, he faces imprisonment of up to twenty years. He has filed a Motion to Dismiss Indictment, ECF No. 32, which the parties fully briefed, ECF Nos. 39 and 43. They argued the Motion at a May 30, 2018 hearing, and I asked them to submit supplemental briefing, ECF No. 50, which they have done ECF Nos. 56, 61, 64, 67. All of their filings other than the Government's Surreply have been under seal. I held a second hearing on August 21, 2018. Because the orders under which he was deported were the result of immigration court procedures that were fundamentally unfair, and he suffered prejudice as a result, Ordoñez's Motion is granted.

---

[1] The terms "deportation" and "removal" are interchangeable for purposes of § 1326. *United States v. Gomez*, 757 F.3d 885, 891 n.1 (9th Cir. 2014). While § 1326(a) refers, *inter alia*, to an alien who has been "deported" or "excluded," the subsequently enacted Illegal Immigration Reform and Immigrant Responsibility Act of 1996 combined those once distinct proceedings into a single category of "removal proceedings." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 349–50 (2005); *Gomez*, 757 F.3d at 891 n.1. Cases post-dating this amendment generally use the term "removal proceedings," although § 1326 continues to refer to "deportation proceedings." *See* 8 U.S.C. § 1326(d)(2).

*United States v. Moreno-Tapia*, 848 F.3d 162, 165 n.1 (4th Cir. 2017).

## **Background**

On April 15, 1997, when Pedro Jose Ordoñez, a citizen of Honduras, was six years old, his mother brought him into the United States illegally, to live in Arizona. Ordoñez Decl. ¶¶ 1, 3, ECF No. 32-4. She "physically abused [him] on a regular basis," both by "beat[ing] him with an electrical cord, clothes hangers or a broomstick" or a belt, and by "throwing stuff at [him], like high heels and bottles." *Id.* ¶ 5. On one occasion, she burned his hand by holding it to an electric burner, and when a "big blister" that "was full of puss" formed on his hand, she did not take him to a doctor to treat it; on another occasion she "scratched [him] all over [his] face." *Id.* ¶¶ 12, 14. His mother was arrested, convicted, and sent to jail for the abuse. During that approximately one year period, Ordoñez lived with his father, whom he had not met until 2001. He was not "as physically abusive" (though far from a model parent). *Id.* ¶¶ 4, 14–15. Six months after his mother returned from incarceration, Ordoñez moved to Florida with his father. *Id.* ¶ 16. His father continued to hit him and, after a year, he agreed to move back in with his mother in Arizona. *Id.* ¶¶ 17–18. This did not end well for Ordoñez. She kicked him out of the house when he was fourteen, and he dropped out of school and lived on the streets. *Id.* ¶¶ 19, 23, 27. By then, he was already having suicidal thoughts. *Id.* ¶ 21.

While he was homeless, he "was arrested several times . . . for being out past curfew" and for petty theft. Ordoñez Decl. ¶¶ 27–28. Then, on March 26, 2007, when Ordoñez was fifteen, his mother's boyfriend accosted him outside his mother's house, yelled at him, and "started pushing, punching and kicking [him]." *Id.* ¶ 29. Ordoñez "tried to walk away" three times without success, after which Ordoñez "swung at him with [his] knife." *Id.* Ordoñez ran away, but the boyfriend chased him and "knocked [him] down," so Ordoñez "stabbed him in the stomach." *Id.* Ordoñez turned himself in and was arrested and detained for 154 days. Aug. 29,

2007 Sentencing Tr. 5–6, ECF No. 32-12; Sept. 22, 2009 Hr'g Tr. 11:20–23.  He was depressed and attempted suicide while detained, May 4, 2007 Incident Report, ECF No. 32-9, and he stated that he was hearing voices, May 22, 2007 Supp. Rept., ECF No. 32-10.  Charged as an adult, he pled guilty at age sixteen to aggravated assault on July 19, 2007 and was sentenced to an additional four months imprisonment in Arizona state jail on August 29, 2007. Aug. 29, 2007 Sentencing Tr. 5–6; *Arizona v. Ordoñez*, (Maricopa Cty. Sup. Ct. July 19, 2007), https://apps.supremecourt.az.gov/publicaccess/caselookup.aspx?AspxAutoDetectCookieSupport =1.  He attempted suicide again on December 29, 2007. Dec. 29, 2007 Incident Rept., ECF No. 32-13.

Meanwhile, Immigration and Customs Enforcement ("ICE") filed an immigration detainer against Ordoñez on August 3, 2007.  Def.'s Mem. 12.  In early 2008, he was transferred to immigration custody at Florence Detention Center, where, according to Ordoñez, he was diagnosed with Schizoaffective Disorder. Mental Health History & Recs., ECF No. 32-14.

### *First Immigration Proceeding*

Ordoñez first appeared in removal proceedings at age sixteen before Immigration Judge Scott Jeffries in Florence, Arizona on January 7, 2008.  He was without an attorney or a guardian counsel; he informed the court that he wanted to find an attorney and challenge his removal.  Jan. 7, 2008 Hr'g Tr., ECF No. 32-16, at 1. At his second appearance ten days later, he requested a bond hearing. Jan. 17, 2008 Hr'g Tr., ECF No. 32-16, at 2.

On January 22, 2008, Ordoñez appeared in immigration court, still without counsel. Arizona Immigration Ct. Hr'g Trs. 2, 4, ECF No. 32-16.  The immigration judge informed him that the Department of Homeland Security ("DHS") asserted that he "should be deported because [he] came into this country illegally and also because [he had] been convicted of a crime

involving moral turpitude." *Id.* at 3. The immigration judge noted that Ordoñez, who is not a U.S. citizen and whose parents are not U.S. citizens, "was brought" to the United States on about April 15, 1997 "[w]ithout documents." *Id.* at 3–4. He also noted that Ordoñez was "treated as an adult in [Arizona] criminal court" and convicted of aggravated assault, which the immigration judge stated was "a crime involving moral turpitude." *Id.* at 4. Based on those facts, the immigration judge found that "both charges of removal ha[d] been sustained by clear and convincing evidence." *Id.* Further, he concluded that Ordoñez was not "eligible for any relief because of [his] crime involving moral turpitude," and therefore he "order[ed] [him] removed from the United States to Honduras." *Id.* He asked Ordoñez if he wanted to appeal the decision, and Ordoñez declined. *Id.*

### *Return to Honduras*

On February 25, 2008, Ordoñez was removed to Honduras, where he maintains he repeatedly was harassed and beaten by the police. Ordoñez Decl. ¶ 35. He recalled:

> After I had been in Honduras for about four to five months, the local police started harassing me. The police arrested me on two occasions and beat me up. They thought I was a gang member and they thought I was involved with gang violence. One of my uncles i[s] involved with the gangs so the police thought that I am a gang member as well. They police also picked me up on a few other occasions and put me into their car and drove around. Every time they picked me up, the police would beat me up. They punched me in the lungs, boxed my ears, kicked me and hit me.

> The police thought I was involved with gang activity and they wanted a payment. They also thought that I had family in the United States that could give me money so they wanted me to make payments to them. Whenever they arrested me or picked me up they would take anything I had on me of value, including cell phone, jewelry, watch, or even my shoes. The police threatened me that if I didn't make payments to the police they would kill me. They would tell me to "watch out for myself."

> I eventually decided that it was not safe for me to remain in Honduras and I decided to return to the United States.

*Id.* ¶¶ 35–37.

*Second Immigration Proceeding*

Ordoñez attempted reentry into the United States on March 17, 2009, at age seventeen. ICE arrested him at the border and placed him in a juvenile detention facility in California. Warrant, ECF No. 32-21. Rather than reinstating his prior deportation order, on March 19, 2009, DHS issued a new Notice to Appear, alleging one ground for deportation: reentry after prior removal. ECF No. 32-27. Then, on May 18, 2009, DHS issued an Amended Notice to Appear, alleging two grounds for deportation: reentry after prior removal, in violation of Immigration and Nationality Act § 212(a)(9)(C)(i)(II), and unlawful presence in the United States, in violation of § 212(a)(6)(A)(i). ECF No. 32-28.

In his admission assessment, Ordoñez's mental health needs were rated "severe" and psychiatric care was recommended. Admis. Assess. 4, ECF No. 32-22. He was transferred to an adult facility in June 2009, when he turned eighteen. Immigration Ct. Docket, ECF No. 32-23. His records from the two detention facilities state that Ordoñez was on suicide watch, reported that he heard voices, and sought mental health assistance. Mental Health Recs., ECF Nos. 34-14, 32-25.

Ordoñez had *pro bono* counsel beginning with his first hearing in April 2009. His attorneys helped him file a claim for asylum, a claim under the Convention Against Torture, and a U nonimmigrant visa ("U visa") application, based on his mother's abuse of him and his cooperation in her investigation and prosecution. At bond hearings on September 22 and 29, 2009, Immigration Judge Michael Yamaguchi determined that Ordoñez was eligible for release because his Arizona assault charge did not qualify as a crime of violence, aggravated felony, or a conviction for immigration purposes. Sept. 29, 2009 Hr'g Tr. 4:15–25. Ordoñez was released on bond on February 3, 2010, in the care of an acquaintance.

At Ordoñez's immigration hearing on May 18, 2010, his attorney asked for additional time because he had just filed the U visa application. At the next immigration hearing, on February 15, 2011, Ordoñez's attorney informed the court that Ordoñez was found eligible for a U visa but denied admissibility because of the 2007 aggravated assault conviction. The next day, Ordoñez filed a request for reconsideration of the decision denying him admissibility.

On July 11, 2011, while out on bond, Ordoñez was convicted of resisting, delaying, or obstructing a public officer, peace officer, or EMT during the course of his or her official duties, with regard to a December 25, 2010 incident; he was sentenced to 110 days of imprisonment. Then, on October 21, 2011, Ordoñez was convicted of receipt of stolen property and possession of a dangerous weapon. On June 3, 2012, he was sentenced to 16 months of imprisonment, and his removal proceedings were administratively closed.

Ordoñez was released from criminal custody and taken into immigration custody on January 9, 2012, and his removal proceedings were reinstated. He appeared for an immigration hearing on February 9, 2012, at which time his motion for reconsideration of his U visa denial still was pending, as well as his application for asylum and claim under the Convention Against Torture. Unfortunately, his *pro bono* attorney withdrew due to lack of funding. The immigration judge told Ordoñez that he would "set [his] case for a master calendar hearing on February 14th." Feb. 9, 2012 Hr'g Tr. 4.

Ordoñez appeared for a removal hearing on February 15, 2012; despite the withdrawal of prior counsel, he had a *pro bono* attorney present. Feb. 15, 2012 Hr'g Tr. 2:5–6. Immigration Judge Yamaguchi noted that DHS was "not arguing that [Ordoñez's] California conviction [was] a ground for [his] deportation," such that Ordoñez's appeal of that conviction was immaterial. *Id.* at 6:2–5. Rather, DHS's claims were that "after having been previously deported out of Arizona,

[he] came back illegally," and that, "as a result, [Ordoñez was in the United States] illegally." *Id.* at 6:5–11. The immigration judge informed Ordoñez that, to challenge his 2008 deportation order, he "would have to go back before the Arizona [immigration] judge to reopen [his] case." *Id.* at 8:13–24.

*Eligibility for Relief*

Ordoñez, speaking directly to the immigration judge and not through counsel, asked about voluntary departure. Feb. 15, 2012 Hr'g Tr. 8:25–9:1. The immigration judge considered Immigration and Nationality Act ("INA") § 240 (8 U.S.C. § 1229a) and observed: "[H]e was not previously branded voluntary departure and he doesn't have an aggravated felony, so I guess he would be [eligible for voluntary departure]." *Id.* at 9:3–16; *see also id.* at 12:19–21 (noting that "he is not statutorily ineligible"). The immigration judge questioned Ordoñez about the "minimum requirement[s]" for voluntary departure, a passport and ability "to reimburse the Government for [his] transportation back to Honduras." *Id.* at 13:12–14:11. Ordoñez stated that he would "be willing to . . . if the Government allowed [him] some time." *Id.* at 14:12–15. DHS opposed voluntary departure, given Ordoñez's convictions. *Id.* at 14:16–25. The immigration judge scheduled a contested voluntary departure hearing for February 28, 2012 so that Ordoñez first could decide whether he wanted to continue with his applications for relief or withdraw them and request voluntary departure. *Id.* at 17:24–20:11.

Ordoñez appeared *pro se* on February 28, 2012 for a voluntary departure hearing before Immigration Judge Yamaguchi. Feb. 28, 2012 Hr'g Tr. He asked about bail, the length of time involved in completing his asylum proceeding, and the implications of voluntary departure and deportation. *Id.* at 3:13–4:13. The immigration judge explained that Ordoñez was "going to have to give up something," by either "withdraw[ing] that asylum application before" the judge

conducted the voluntary departure hearing or "for[e]go[ing] voluntary departure and [having the judge] set a hearing date for [his] application for asylum." *Id.* at 7:9–22. The immigration judge told Ordoñez that it would take three months to schedule an asylum hearing, and offered to do so. But, in the interim, Ordoñez would remain incarcerated. Significantly, the immigration judge also advised him that, if he pursued voluntary departure and was not "happy with the [judge's] decision, [he could] always appeal." *Id.* at 5:5–8. Ordoñez initially said: "[Y]eah. I have to give it up [the possibility of asylum following three more months of incarceration]. It's – being incarcerated is not doing my brain any good and my body nothing." *Id.* at 7:23–25. He said he would "take [his] chances" with regard to possible deportation, because he did not "want to be incarcerated [any] more." *Id.* at 8:1–3, 18–19, 22. He stated that he "fe[lt] like [he had] no choice." *Id.* at 8:19.

Once again, the immigration judge inquired about the "minimum requirements" for voluntary departure. *Id.* at 5:14–23. Stating that he had a Honduran passport, Ordoñez asserted: "I don't have the money right now to pay the Government for my flight. But if I could work a way of repaying it . . . within a period of time." *Id.* at 5:16–6:7. Noting the January 2, 2008 deportation order, Judge Yamaguchi then concluded that Ordoñez was "not eligible [for voluntary departure] because [he] got a prior deportation" that "disqualifie[d] him." Feb. 28, 2012 Hr'g Tr. 9:11–11:1. Citing INA § 241(a)(5), codified at 8 U.S.C. § 1231, he said: "[T]he law says if you have been previously deported [or been granted a voluntary departure], you can't be granted voluntary departure." *Id.* at 11:14–12:12; *see also id.* at 20:18–20 ("[U]nder 241(a)(5) I think because of that prior deportation, you are precluded. Not unless you can reopen that case, and I wasn't the judge who handled that.").

The immigration judge explained that, if Ordoñez pursued voluntary departure but was not eligible due to the prior deportation order, he would be deported, which would bar him from reentering the United States for ten years. *Id.* at 13:12–17:8. He advised Ordoñez that "the safer way" was "to go to the merits" of his asylum application, because the immigration judge did not think Ordoñez could "get . . . voluntary departure, not unless [he] reopen[ed] that other case out of Arizona." *Id.* at 16:7–10. Ordoñez stated: "I can't think straight," and the immigration judge reiterated that he thought that, instead of a voluntary departure hearing, "the safer way to go about this" was "to hear about why [Ordoñez was] afraid to go back to Honduras." *Id.* at 17:9– 12. He stated that DHS could not "hold [the California conviction] against [Ordoñez] because it [was] on appeal." *Id.* at 17:13–25. The immigration judge informed Ordoñez again that he did not "think [he was] eligible for voluntary departure . . . because of 241(a)(5)" and "the only thing [he had] available to [him was] this 589 [asylum application] that [he had] on file about why [he was] afraid to go back to Honduras." *Id.* at 19:16–20. And, he advised him once again: "[T]he only way you are going to get out of incarceration now, it is either you are going to be deported or you are going to be granted withholding about your fear of going back to Honduras." *Id*. at 20:1–4.

Despite the immigration judge's repeated observations that Ordoñez was not eligible for voluntary departure and his repeated advice that Ordoñez should pursue asylum even though his hearing would not be for another three months, Ordoñez stated that he was "afraid of being incarcerated," acknowledged (resignedly) that "there's absolutely no way of getting the voluntary departure," and then chose to be deported because he did not "want to be incarcerated [any] more." *Id.* at 19:24–23:7. But then, when the immigration judge stated that (contrary to his prior advice) Ordoñez would be waiving his right to appeal the deportation order, and that he had

reached "the end of the proceedings," 25:24–26:17, Ordoñez asked again about asylum, apparently not quite as ready to withdraw his asylum application if he also had to waive his appeal rights:

> [ORDOÑEZ]: You need evidence to prove that; right? That is going to --
>
> THE COURT: Not me. You. You need evidence.
>
> [ORDOÑEZ]: Right. I mean -- of course, I would need evidence to prove that; right?
>
> THE COURT: Correct.
>
> [ORDOÑEZ]: See, I don't have any evidence.

*Id.* at 27:13–20. Based on his exchange with the immigration judge, Ordoñez understood that to pursue his asylum claim he would need "evidence." But, what he clearly did not understand (because the immigration judge did not explain this to him) was that "evidence" could include *his own* testimony. Believing that he lacked the evidence to succeed, a defeated Ordoñez withdrew his asylum application. *Id.* at 27:21–22.

The attorney representing DHS then became concerned that, in light of Ordoñez's many questions, the deportation order might not be "rock solid,"[2] and asked if Ordoñez should have additional time to seek legal advice:

> This gentleman is asking Your Honor so many questions that have so many different variable answers depending on any of these facts. The Department is raising this concern because I want to make sure that what the Respondent is asking of Your Honor today is what he really wants to do and that he doesn't want to have time to go ask a lawyer all of these questions that he has been asking . . . .

*Id.* at 32:5–11. The immigration judge asked Ordoñez if he wanted "to go talk to a lawyer," *id.* at 32:21, and Ordoñez responded:

---

[2] DHS counsel's desire to secure a "rock solid" deportation order apparently did not extend so far as to fulfill their obligation to bring to the attention of the immigration judge the extensive evidence in its records of Ordoñez's serious mental health issues, so that a competency determination could be made. *See, e.g.*, *In re M–A–M–*, 25 I. & N. Dec. 474, 479 (BIA 2011)).

> No, I understand what is going on. I have to ask the questions that I have to . . . .
> I don't know the law. And that is why I thought I could ask you. . . .
>
> I understand what is going on. It is a valid thing. I am giving up my right
> [to pursue asylum]. I want to be deported. I don't want to be incarcerated [any]
> more. . . . I wish it wasn't this way . . . . I don't [have] the funds to fight it
> anymore and the will, the power, . . . the strain, mentality.

*Id.* at 32:23–33:15. And so, Ordoñez threw in the towel. He agreed to abandon his asylum claim and right to appeal, and agreed to be deported.

The immigration judge found "by clear and convincing evidence the allegation against Respondent have [sic] been sustained. That is in the notice to appear in the I-261. . . . The Court finds the Respondent knowingly and voluntarily withdrew his app 589." *Id.* at 33:18–22. The immigration judge offered again "to give [Ordoñez] more time if [he] want[ed] to go talk to a lawyer or just to make sure everything [he] told [him] is correct, or that there may be some other avenues that [the judge] just [did not] know about," but Ordoñez said: "No, I am fine." *Id.* at 33:24–34:5. On March 22, 2012 Ordoñez was deported to Honduras. He reentered the United States on April 30, 2017, and ICE took him into custody once again and issued a notice of reinstatement of the 2008 deportation order.

## Criminal Prosecution

On June 7, 2017, Ordoñez was indicted and charged with one count of illegal reentry into the United States after prior removal, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Indictment, ECF No. 1. Specifically, the indictment charges that Ordoñez,

> an alien who previously had been deported and removed, after having been
> convicted of an aggravated felony, knowingly entered and was found in the
> United States of America, the said defendant having not obtained the express
> consent of the Attorney General of the United States or his successor, the
> Secretary for Homeland Security (Title 6, United States Code, Sections 202(3),
> 202(4) and 557), to reapply for admission into the United States as required by
> law.

*Id.*

Section 1326(a) provides that, "[s]ubject to subsection (b), any alien who . . . (1) has been . . . deported, or removed . . . and thereafter (2) enters, attempts to enter, or is at any time found in, the United States," with exceptions not relevant here, "shall be fined under Title 18, or imprisoned not more than 2 years, or both." Section 1326(b)(2), in turn, provides that, with regard to any alien "whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both." To prove this crime, the Government must establish four elements beyond a reasonable doubt:

> First, that the defendant was an alien at the time of the offense alleged in the indictment;
>
> **Second, that prior to the time of the offense alleged in the indictment, the defendant had been deported from the United States**;
>
> Third, that the defendant improperly entered (*or* attempted to enter *or* was found in) the United States; and
>
> Fourth, that the defendant had not received the express permission of the Attorney General to apply for readmission.

*See* Sand, MFJI 33A-33 (emphasis added). Notably, commission of an aggravated felony is not an element of the offense. *See id.* Thus, although, if convicted, Ordoñez cannot be subject to imprisonment for more than two years if the Court does not find that his prior conviction was for commission of an aggravated felony, *compare* 8 U.S.C. § 1326(a), *with* 8 U.S.C. § (b)(2), the Government still can prove that he entered illegally after prior removal, if he also or alternatively was removed on a different basis. *See* 8 U.S.C. § 1326(a); Sand, MFJI 33A-33.

In his Motion to Dismiss the Indictment, Ordoñez focuses on the second element, arguing that the Government cannot prove it because he never was deported pursuant to a lawful deportation order. Def.'s Mem. Indeed, "a collateral challenge to the use of a deportation

proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." *See United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (19897); *see also United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005). Here, the evidence establishes that in Florence, Arizona, Immigration Judge Scott Jeffries issued a deportation order as to Ordoñez on January 22, 2008. Ordoñez reentered the United States on March 17, 2009, and Immigration Judge Michael Yamaguchi, in San Francisco, California, issued a second deportation order on February 28, 2012. If lawful, either of these orders could serve as the predicate order for purposes of the second element. Thus, the issue is whether either order is a lawful deportation order.

### Standard of Review

To prevail on a motion to dismiss an indictment based on the unlawfulness of the underlying deportation order, a defendant must show

    (1) that he exhausted any available administrative remedies regarding the order,

    (2) that he was improperly deprived of the opportunity for judicial review at his deportation proceedings, and

    (3) that "the entry of the order was fundamentally unfair."

8 U.S.C. § 1326(d). To show that "entry of the order was fundamentally unfair," *id.*, the defendant must demonstrate

    (1) that his due process rights were violated in the deportation proceeding,[3] and

---

[3]     "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."). An alien "may not be deprived of his life, liberty or property without due process of law," meaning that "before his expulsion, he is entitled to notice of the nature of the charge and a hearing at least before an executive or administrative

(2) that the rights violation(s) caused him actual prejudice.

*United States v. Lopez-Collazo*, 824 F.3d 453, 460 (4th Cir. 2016), *cert. denied,* 137 S. Ct. 628 (2017); *see also Diop v. Lynch*, 807 F.3d 70, 74–75 (4th Cir. 2015) ("To establish a due process violation, the respondent must prove both 'that the defect in the proceeding rendered it fundamentally unfair" and "that the defect prejudiced the outcome of the case.'" (quoting *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008)).

Prejudice exists if, "but for the errors complained of, there was reasonable probability that he would not have been deported." *El Shami*, 434 F.3d at 665. Importantly,

> [t]his is not a generalized showing of prejudice; rather, the defendant must link the actual prejudice he claims to have suffered to the specific due process violation at issue. *See United States v. Fernandez–Antonia*, 278 F.3d 150, 159 (2d Cir. 2002) ("[Defendant] must show both a fundamental procedural error and prejudice resulting from *that error*." (emphasis added)); *Garcia–Martinez*, 228 F.3d at 963 (explaining that a defendant "must demonstrate that prejudice resulted from *the asserted procedural defect*" (emphasis added)).

*Lopez-Collazo*, 824 F.3d at 462. "[I]f the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law." *El Shami*, 434 F.3d at 663.

## January 22, 2008 Deportation Order

In 2008, the Arizona immigration judge advised Ordoñez that he was not "eligible for any relief," because, as he interpreted the law, Ordoñez's Arizona assault conviction qualified as

---

tribunal." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596–97 (1953). Due process requires, at a minimum, that an alien be given "(1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard." *El Shami*, 434 F.3d at 665 (internal quotation marks omitted).

*United States v. Lopez-Collazo*, 824 F.3d 453, 460–61 (4th Cir. 2016), *cert. denied,* 137 S. Ct. 628 (2017); *see also Diop v. Lynch*, 807 F.3d 70, 74 (4th Cir. 2015) ("Respondents in removal proceedings are entitled to procedural due process." (citing *Reno v. Flores,* 507 U.S. 292, 306 (1993))).

a crime involving moral turpitude, which rendered him ineligible. Arizona Immigration Ct. Hr'g Trs. 4; *see* 8 U.S.C. § 1229c(a)(1) (providing that an alien is not eligible for voluntary departure if he or she has been convicted of an aggravated felony); *see also* 8 U.S.C. § 1101(a)(43)(F) (defining aggravated felony as "a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] *at least one year*" (emphasis added)). The immigration judge's statement was both an error of law and a due process violation. Indeed the Government does not even attempt to salvage the 2008 deportation order, focusing instead on the 2012 order:

> The Government concedes . . . that this conviction did not count as a crime of violence under 8 U.S.C. § 1101(a)(43)(F) for the reason that Defendant did not receive a sentence of at least a year. *See* Exh. O at PJO_1420-21. Because it is not a crime of violence under § 1101(a)(43)(F), it is not an aggravated felony. The conviction thus did not make Mr. Ordoñez ineligible for voluntary departure in 2008, although the IJ could have considered the conviction, which the Government believes would qualify as a crime of violence had Mr. Ordoñez received a longer sentence . . . in deciding whether to grant such relief.

Gov't Supp. 2–3 n.1 (case citations omitted).

I agree that, for the simple reason that his term of imprisonment was less than one year, Ordoñez's Arizona conviction did not qualify as an aggravated felony for immigration purposes. *See* 8 U.S.C. § 1101(a)(43)(F);[4] *see also* 8 U.S.C. § 1101 ("Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include *the period of*

---

[4] Certainly, the recent Supreme Court case, *Sessions v. Dimaya*, held that language of 8 U.S.C. § 1101(a)(43)(F) defining a "crime of violence" by reference to 18 U.S.C. § 16 is unconstitutionally vague. 138 S. Ct. 1204, 1210 (2018) (applying the reasoning of *Johnson v. United States*, 576 U.S. ----, 135 S. Ct. 2551 (2015)). But here, the issue is not whether Ordoñez's Arizona conviction was a "crime of violence"; it is whether the conviction was for more than a year. Moreover, *Dimaya* specifically addressed the definition of "crime of violence" in 18 U.S.C. § 16(b), not the much broader definition of "aggravated felony" in 8 U.S.C. § 1101(a)(43)(F). In any event, I conclude that Ordoñez's Arizona conviction, with its term of imprisonment of less than one year, did *not* qualify as an aggravated felony for immigration purposes; it is not a conclusion that relies on an unconstitutionally vague statutory provision.

*incarceration or confinement ordered by a court of law* regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part" (emphasis added)). Therefore, the Arizona immigration judge erred in finding him ineligible for relief.

### *Due Process Violation*

"[A]n error of law, without more, 'will ordinarily not rise to the level of a due process violation.'" *United States v. Lopez-Collazo*, 824 F.3d 453, 467 (4th Cir. 2016) (quoting *United States v. Torres*, 383 F.3d 92, 104 (3d Cir. 2004)), *cert. denied*, 137 S. Ct. 628 (2017). But, the Fourth Circuit recently observed that "there might be circumstances under which some courts would conclude that a misapplication of the law as it existed at the time . . . led to a due process violation," and that "[u]nder such circumstances, it might be possible for the court to conclude that 'but for' the misapprehension of the law, defendant would not have been removed." *Lopez-Collazo*, 824 F.3d at 467. In *United States v. Miranda-Rivera*, relying on *Lopez-Collazo*, Judge Blake of this Court considered an immigration judge's duty to inform an alien of his eligibility for relief under 8 C.F.R. § 1240.11(a)(2). 206 F. Supp. 3d 1066, 1070–71 (D. Md. 2016). That section *requires* that "[t]he immigration judge *shall inform* the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and *shall afford* the alien an opportunity to make application during the hearing, in accordance with the provisions of § 1240.8(d)." 8 C.F.R. § 1240.11(a)(2) (emphasis added). Judge Blake concluded that the immigration judge's "failure to inform Mr. Miranda Rivera of his ability to apply for asylum and withholding of removal deprived Mr. Miranda Rivera of his right to due process under the law." 206 F. Supp. 3d at 1070–71.

With regard to why a failure to advise of apparent eligibility for discretionary relief is a due process violation, *United States v. Itehua*, No. 17-CR-119, 2018 WL 1470250 (E.D. Va.

Mar. 26, 2018), offers insight. There, as here, the defendant "argue[d] that the government relie[d] on a flawed underlying deportation order because the IJ did not properly inform him of his eligibility to seek voluntary departure." *Id.* at *2. The court stated that "a right to seek relief differs from a right to the relief itself," noting that "[t]he Code of Federal Regulations requires immigration judges to 'inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and [to] afford the alien an opportunity to make application during the hearing.'" *Id.* at *2–3 (quoting 8 C.F.R. § 1240.11(a)(2); citing *United States v. Copeland*, 376 F.3d 61, 72 (2d Cir. 2004)).

The district court also "distinguish[ed] between appealing an IJ's disposition regarding discretionary relief from deportation, and challenging the validity of a prior deportation in a criminal prosecution for illegal reentry." *Id.* at *3. It stated that "due process requires courts to review underlying deportation proceedings when the government criminally prosecutes a defendant for illegal reentry." *Id.* (citing *Smith v. Ashcroft*, 295 F.3d 425, 429, 430–31 (4th Cir. 2002)). Further, a collateral attack on a deportation order may be based on the deprivation of discretionary relief in the deportation proceeding. *Id.* (observing that in her concurrence in *United States v. Wilson*, 316 F.3d 506, 515 (4th Cir. 2003), Judge Diana Motz "not[ed] that criminal defendants have a liberty interest in avoiding imprisonment based on a fundamentally unfair deportation proceeding"). On that basis, the court concluded that the due process issue before it "concern[ed] not whether the Constitution mandates relief from deportation, but whether the IJ committed a fundamentally unfair procedural error by failing to inform Itehua of the possibility of that relief and neglecting to allow him to apply during his hearing." *Id.* It found that "Itehua has satisfied the due process prong" because, "[b]ased on the relevant factors, Itehua might have been eligible for voluntary departure at the time of his 2011 hearing." *Id.* The court

also found prejudice, reasoning that "[i]f Itehua had the opportunity to apply for pre-conclusion voluntary departure, he likely would have qualified because he had no aggravated felony convictions and did not pose a threat to national security," and at the conclusion of his proceedings, he "had a reasonable probability to receive relief, even accounting for the IJ's discretion," given his "limited criminal history" and the fact that he had "family and friends who could have helped him fund the trip to Mexico." *Id.*

Here, the Arizona immigration judge erroneously believed that Ordoñez was not eligible for relief from deportation based on his assault conviction in Arizona state court. In reality, the assault conviction did not qualify as an aggravated felony for purposes of the deportation proceeding. Thus, because he had not committed an aggravated felony, Ordoñez appeared eligible for relief from deportation, at least in the form of voluntary departure (if not also by acquiring status as a special immigrant juvenile or under the U visa nonimmigrant status program), and the immigration judge failed to so inform him, in violation of 8 C.F.R. § 1240.11(a)(2). It was a "fundamentally unfair procedural error" to misinform Ordoñez that he was not eligible for relief, and it constituted a violation of Ordoñez's due process rights. *See Itehua*, 2018 WL 1470250, at *3; *Miranda-Rivera*, 206 F. Supp. 3d at 1070; *see also Lopez-Collazo*, 824 F.3d at 467; *United States v. Valdez–Novoa*, 780 F.3d 906, 914 (9th Cir. 2014) (noting that "[t]he government expressly conceded . . . that the IJ's failure to advise Valdez-Novoa of his eligibility for voluntary departure relief was a due process violation"); *United States v. Angulo-Galaviz*, No. 17CR3671-CAB, 2018 WL 1942367, at *7 (S.D. Cal. Apr. 25, 2018) ("If the record raises a reasonable possibility the alien may be eligible for relief [i.e., a waiver of deportation], the IJ must inform the alien of this possibility and give him the opportunity to develop the issue. Failure to do so is denial of due process. . . . *An IJ breaches the*

*obligation to inform an alien of 'apparent eligibility'* when the IJ either fails to give the alien any information about the existence of relief for which the alien is 'apparently eligible,' or *when the IJ erroneously tells the alien that no relief is available*, or states the alien is eligible for relief but immediately negates that statement." (citing *United States v. Gonzalez-Flores*, 804 F.3d 920, 927 (9th Cir. 2015); *United States v. Muro-Inclan*, 249 F.3d 1180, 1183 (9th Cir. 2001))).

<u>Actual Prejudice</u>

But, for a finding of fundamental unfairness to support dismissal of an indictment, there must be more than a due process violation alone; there also must be a showing of prejudice. *United States v. Lopez-Collazo*, 824 F.3d 453, 460 (4th Cir. 2016). To determine prejudice, I must consider whether, if the Arizona immigration judge had informed Ordoñez that he was eligible for relief from deportation, "there was reasonable probability that he [would have obtained that relief and he] would not have been deported." *El Shami*, 434 F.3d at 665. Prior to the issuance of the 2008 removal order, Ordoñez had various forms of relief available to him: he could have sought voluntary departure, status as a special immigrant juvenile, or a U visa.

> Voluntary departure allows aliens to leave the country willingly in lieu of deportation. 8 U.S.C. § 1229c; *Dada v. Mukasey*, 554 U.S. 1, 8 (2008). It "facilitates the possibility of readmission," by eliminating the lengthy waiting periods attending involuntary removal. *Dada*, 554 U.S. at 11–12. An alien may apply for voluntary departure *before* the conclusion of removal proceedings, or the alien may request voluntary departure *at* the conclusion of removal proceedings. *In re Arguelles-Campos*, 22 I. & N. Dec. 811, 813 (BIA 1999). Different eligibility requirements apply depending on when the alien makes the voluntary departure request. *Id.* at 814. To receive voluntary departure at the conclusion of proceedings, an alien must show:
>
>> (A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 1229(a) of this title;
>>
>> (B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

> (C) the alien is not deportable under section 1227(a)(2)(A)(iii) or section 1227(a)(4) of this title;[] and
>
> (D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.
>
> 8 U.S.C. § 1229c(b)(1).
>
> If an alien applies before removal proceedings conclude, he must concede removability, waive appeal, have no aggravated felony convictions, and pose no threat to national security. *Arguelles-Campos*, 22 I. & N. Dec. at 815 [(citing 8 C.F.R. § 240.26(b)(1))]. To receive pre-conclusion voluntary departure, an alien need not show good moral character or that he has the financial means to depart. *Id.* at 817. An alien cannot receive either type of voluntary departure if an IJ previously permitted him to depart voluntarily. 8 U.S.C. § 1229c(c). The IJ has discretion regarding these applications, and should consider factors such as the nature and circumstances of the grounds for deportation, additional immigration violations, criminal record, and character. *Arguelles-Campos*, 22 I. & N. Dec. at 817. Certain circumstances, like long residence and family in the United States, can mitigate adverse factors. *Id.*

*Itehua*, 2018 WL 1470250, at *2. Pre-conclusion voluntary departure is available only if the individual "[m]akes such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing." 8 C.F.R. § 1240.26(b)(1)(i)(A); *see In Re Arguelles-Campos*, 22 I. & N. Dec. 811, 813–14 (BIA 1999). After "the case is initially calendared for a merits hearing," the immigration judge only may grant a voluntary departure if the individual makes the showing required under 8 U.S.C. § 1229c(b)(1). *See In re Arguelles-Campos*, 22 I. & N. Dec at 814; 8 C.F.R. § 1240.26(c); *see also* 8 U.S.C. § 1229c(b)(1).

As for whether the immigration judge must inform the individual of possible relief in time for him to seek pre-conclusion voluntary departure, *United States v. Soto-Garcia*, No. 16-cr-2641-GPC, 2017 WL 991106 (S.D. Cal. Feb. 8, 2017), is informative. There, the United States District Court for the Southern District of California concluded that it was a due process error when an immigration judge "did not adequately advise [the defendant] of his eligibility for *pre-conclusion* voluntary departure or give him an opportunity to apply." *Id.* at *3–4. The court

ultimately concluded that no prejudice resulted because "it was not plausible that Soto would have been the recipient of a discretionary grant of pre-conclusion voluntary departure."

Ordoñez was arrested more than once as a juvenile, and one of the charges was the previously-discussed aggravated assault charge. But, Ordoñez's circumstances "can mitigate [the] adverse factors." *See Itehua*, 2018 WL 1470250, at *2. Specifically, Ordoñez entered the country as a six year old, about a decade prior to the removal proceedings, and both of his parents lived in the United States (albeit illegally and without providing support to him). Additionally, he incurred his criminal charges as a homeless youth, the aggravated assault charge resulted from acts of self-defense, and he suffered considerable abuse by his mother, as well as abuse and neglect by his father. Ordoñez, like Itehua, "likely would have qualified" for pre-conclusion voluntary departure and avoided deportation "because he had no aggravated felony convictions and did not pose a threat to national security." *See Itehua*, 2018 WL 1470250, at *4. And, like Itehua, Ordoñez "had a reasonable probability to receive relief, even accounting for the IJ's discretion," given his "limited criminal history [as a juvenile]" and the substantial mitigating factors. *See id.* Unlike Itehua, however, it is unclear whether Ordoñez had "family and friends who could have helped him fund the trip" back to Honduras. *See id.* Nonetheless, because it was reasonably probable that he would have qualified for pre-conclusion voluntary departure, which does not require proof of an ability to pay, Ordoñez has shown prejudice.[5] Therefore, he has demonstrated fundamental unfairness. *See Lopez-Collazo*, 824 F.3d at 460.

---

[5] Because Ordoñez has shown prejudice based on the immigration judge's failure to inform him of his eligibility for voluntary departure, I need not consider whether he was eligible for special immigrant juvenile status or a U visa. Nor need I consider his argument that the 2008 deportation order was unlawful because the immigration judge failed to inquire about his competence to proceed *pro se*, even though he was a minor with documented mental health issues.

As noted, to prevail on a motion to dismiss an indictment based on the unlawfulness of the underlying deportation order, in addition to proving fundamental unfairness in the entry of the order, a defendant also must show that he exhausted any available administrative remedies regarding the order, and that he was improperly deprived of the opportunity for judicial review at his deportation proceedings. 8 U.S.C. § 1326(d). Here, because the immigration judge "did not adequately explain to [Ordoñez] that he might qualify for relief—namely, voluntary departure— . . . he did not understand that he had anything to appeal," and therefore he "did not have the opportunity to seek judicial or administrative review." *See Itehua*, 2018 WL 1470250, at *3 (reaching same result). Thus, Ordoñez has established all requirements for the 2008 deportation order to be unlawful. It, therefore, cannot provide the basis for the Government's proof of the second element of illegal reentry.[6]

## February 28, 2012 Deportation Order

### *Jurisdiction*

"Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 1003.14(a). A notice to appear is one form of charging document. *See* 8 C.F.R. § 1003.13. "The charging document must include a certificate showing service on the opposing party pursuant to § 1003.32 which indicates the Immigration Court in which the charging document is filed." 8 C.F.R.

---

[6] It is true that the immigration judge found that "both charges of removal"—commission of a crime involving moral turpitude and simple presence in the United States illegally—"ha[d] been sustained by clear and convincing evidence." There is no question that Ordoñez was present in the United States illegally and removable on that ground. But, as this discussion has shown, the deportation proceeding violated his due process rights and therefore, even though he could have been removed for being present in the United States, the deportation order could not have been lawfully issued following the deficient procedures that the immigration judge followed.

§ 1003.14(a). And, a notice to appear must state "[t]he nature of the proceedings against the alien," as well as other details including "[t]he time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1).

In his Supplemental Reply, Ordoñez questions the California immigration court's jurisdiction for the first time, challenging the sufficiency of the notices he received, based on a June 21, 2018 Supreme Court decision, *Pereira v. Sessions*, 138 S. Ct. 2105 (2018). *See* Def.'s Supp. Reply 7; *see also* Gov't Surreply 1 (filed by consent to address new argument). In *Pereira*, the Supreme Court answered a "narrow question" regarding how a "document that is labeled 'notice to appear,' but . . . fails to specify either the time or place of the removal proceedings" affects when a nonpermanent resident's "continuous physical presence in the United States . . . . is 'deemed to end'" for purposes of eligibility for cancellation of removal under § 1229b(b)(1). 138 S. Ct. at 2109–10. It held that "a notice that does not inform a noncitizen when and where to appear for removal proceedings is not a 'notice to appear under section 1229(a)' and therefore does not trigger the stop-time rule." *Id.* Ordoñez reads this holding far more broadly, relying on a decision from the United States District Court for the Eastern District of Washington and an Washington immigration court decision, *United States v. Virgen-Ponce*, No. 18-92-WFN (E.D. Wash. July 26, 2018) (slip op.), ECF Nos. 64-1; *In re ----*, (Wash. Imm. Ct. July 10, 2018), ECF No. 64-3, neither of which is binding on this Court. He asserts that the immigration courts lacked jurisdiction over him because the Notices to Appear that he received failed to state the time and place of his removal proceedings. Def.'s Supp. Reply 7–8.

Insofar as Ordoñez challenges the 2008 Notice to Appear on this ground, I already have determined that the 2008 deportation order was not valid. As for the March 19, 2009 Notice to

Appear, it is true that the notice simply ordered Ordoñez "to appear before an immigration judge of the United States Department of Justice at: 'TO BE CALENDARED, AND NOTICE PROVIDED BY THE OFFICE OF THE IMMIGRATION JUDGE.' on a date to be set at a time to be set . . . ." ECF No. 39-4; *see also* ECF No. 32-27 (same); Gov't Surreply 1 (conceding that "the initial NTAs with which DHS served Mr. Ordoñez did not list the date, time, and location of his initial immigration hearings"). And, the May 18, 2009 Amended Notice filed on the record, which supplements the Notice to Appear without restating the initial charge, also does not include a time or place. ECF No. 39-6; *see also* ECF No. 32-28 (same). But, on April 13, 2009, the San Francisco immigration court personally served Ordoñez with a "Notice of Hearing in Removal Proceedings," which stated that his case had "been scheduled for a . . . MASTER . . . hearing before the Immigration Court on MAY 18, 2009 at 100 [sic] at: 630 SANSOME STREET – 4th FLOOR, COURTROOM 1, SAN FRANCISCO, CA 94111." Notice, ECF No. 67-1.

Certainly, it was the court, not DHS, that served Ordoñez with the notice, and it was a Notice *of Hearing*, not a Notice *to Appear*, and Ordoñez challenges its sufficiency on those grounds. But, "service of a Notice to Appear that indicates that the date and time of a hearing is forthcoming, followed by service of a separate notice specifying the precise date and time of the hearing, satisfies the notice requirements of [8 U.S.C. § 1229(a)(1)]." *Guamanrrigra v. Holder*, 670 F.3d 404, 409 (2d Cir. 2012). In *Guamanrrigra*, the individual was served with a notice to appear that "ordered him to appear before an IJ at a date and time 'to be set.'" *Id.* at 410. A few weeks later, "the immigration court in Boston sent Guamanrrigra a follow-up hearing notice stating that his hearing was scheduled to take place," and providing the date, time and location. *Id.* The Second Circuit held that, "[b]ecause these two notices, together, provided the specific

notice required by [§ 1229(a)(1)], . . . the statutory notice requirements were satisfied." *Id.* In reaching this conclusion, the court "adopted the rationale articulated by the Seventh Circuit in *Dababneh v. Gonzales*, 471 F.3d 806 (7th Cir. 2006), observing:

> In *Dababneh,* the Seventh Circuit held that the notice requirements of § 239(a)(1) [§ 1229(a)(1)] may be satisfied by a combination of documents that, jointly, provide the specific notice required by the statute. 471 F.3d at 810 ("[T]he fact that the government fulfilled its requirements under INA § 239(a) in two documents did not strip the IJ of jurisdiction."). In so holding, the Seventh Circuit recognized that circumstances often arise that make it impracticable for the DHS to provide an alien with the precise date and time of his initial removal hearing at the moment it serves the initial Notice to Appear, and that in these instances, the DHS "may indicate in the NTA that it will give the alien subsequent notice of the precise [date and time] of the hearing once it files the NTA with the appropriate immigration court." *Id.* at 809 (citing 8 C.F.R. § 1003.18).

*Id.* at 409–10. *But see Shogunle v. Holder*, 336 F. App'x 322, 323–24 (4th Cir. 2009) (unpublished) (stating that "the [immigration] court did not have jurisdiction over Shogunle's case" until "DHS filed the notice to appear with the immigration court," but not addressing whether a notice to appear that does not state time and place can give rise to jurisdiction after the immigration court serves the individual with a notice of hearing. I find that the reasoning of the Second and Seventh Circuits is more persuasive than that of the unpublished (and non-precedential) *Shogunle* decision, in which the court was not called upon to reach the precise issues presented here.

Moreover, an individual may waive his jurisdictional argument in immigration court by conceding removability without challenging the sufficiency of notice, which is what happened when Ordoñez appeared in immigration court in California. *See Qureshi v. Gonzales*, 442 F.3d 985, 990 (7th Cir. 2006) (holding that, "[b]ecause Qureshi failed to object to the admission of the NTA, conceded his removability, and pleaded to the charge in the NTA, all before claiming that the certificate of service was defective, he has waived his challenge to the IJ's jurisdiction over

the removal proceedings"); *see also Nolasco v. Holder*, 637 F.3d 159, 162–63 (6th Cir. 2011) (citing *Qureshi* and noting that petitioner "arguably waived" her jurisdictional argument by conceding to removability and failing to raise the issue of improper service in immigration court or on appeal; reaching the merits to determine, as a matter of first impression, "whether service of the NTA violates a fundamental right when it is only effectuated upon a minor," and concluding it does not); *Chambers v. Mukasey*, 520 F.3d 445, 449–50 (5th Cir. 2008) (citing *Qureshi* and holding that Mukasey "waived any challenge to the NTA by appearing at her initial removal hearing, failing to object to the NTA at that initial hearing, and pleading to the charges contained in the NTA," even though she "did not concede removability"). Thus, even if the *Pereira* holding has the broad jurisdictional implications that Ordoñez views it to have, Ordoñez has not shown that the 2009 Notice to Appear, in combination with the Notice of Hearing, did not provide him with the required notice or that he did not waive this argument, and his jurisdictional challenge appears to be without merit. In any event, it is a challenge to the immigration court's jurisdiction, not this Court's jurisdiction. Because the indictment must be dismissed on other grounds, resolution of this argument is not essential to deciding the issues before me.

*Due Process Violation*

The May 18, 2009 Amended Notice to Appear identified two bases for removal: unlawful presence, in violation of 8 U.S.C. § 1182(a)(6)(A)(i), and unlawful reentry after prior deportation, in violation of 8 U.S.C. § 1182(a)(9)(C)(i). ECF No. 32-28. These sections provide that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible," 8 U.S.C. § 1182(a)(6)(A)(i), and "[a]ny alien who . . . (II) has been ordered

removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law, and who enters or attempts to reenter the United States without being admitted is inadmissible," 8 U.S.C. § 1182(a)(9)(C)(i).

The 2012 deportation order, insofar as it was based on the invalid 2008 order, pursuant to 8 U.S.C. § 1182(a)(9)(C)(i), cannot stand. But, to the extent that the 2012 deportation order was based on unlawful presence in the United States, it is independent from the 2008 order. Thus, I must consider whether the 2012 deportation order on the ground of unlawful presence was fundamentally unfair as a result of a due process violation that caused actual prejudice.

*Competence*

"To order the removal of someone unable to participate meaningfully in his or her removal proceedings would make the whole process a charade" in which the immigration court did not afford the individual procedural due process. *Diop v. Lynch*, 807 F.3d 70, 76 (4th Cir. 2015). Therefore, the immigration judge must consider the individual's mental competence, that is, "whether the respondent (1) 'has a rational and factual understanding of the nature and object of the proceedings,' (2) 'can consult with the attorney or representative if there is one,' and (3) 'has a reasonable opportunity to examine and present evidence and cross-examine witnesses.'" *Id.* at 75 (quoting *In re M–A–M–*, 25 I. & N. Dec. 474, 479 (BIA 2011)). Mental competence is "an issue of fact," and the immigration judge "starts with a presumption of competence." *Id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *In re M–A–M–*, 25 I. & N. Dec. at 479). Then, if there are "no indicia of incompetency, the inquiry is at an end." *Id.*

The immigration judge "determine[s] by a preponderance of the evidence whether the respondent is competent" and is not required to "ask any particular question, request any particular evaluation, or adopt any particular safeguard." *Diop*, 807 F.3d at 75. The immigration

judge assesses the respondent's "credibility and demeanor" and "decide[s] whether [he] is honestly failing to understand the proceedings or is instead putting on an act." *Id.* at 75–76. The Court reviews the immigration judge's "factual finding of competency . . . under the substantial evidence standard and treat[s] [the finding] as conclusive unless the evidence presented 'was such that any reasonable adjudicator would have been compelled to conclude to the contrary.'" *Id.* at 75 (quoting *Haoua v. Gonzales,* 472 F.3d 227, 231 (4th Cir. 2007)).

Counsel for the DHS has an independent obligation to inform the immigration judge about the individual's mental health when DHS has evidence that raises an issue of competency , as "[t]he DHS will often be in possession of relevant evidence, particularly where the alien is detained." *See M–A–M–,* 25 I. & N. Dec. at 480. When this is the case, "[t]he DHS has an obligation to provide the court with relevant materials in its possession that would inform the court about the respondent's mental competency." *Id.* Indeed, 8 C.F.R. § 1240.2(a) provides that "[DHS] counsel shall present on behalf of the government evidence material to the issues of deportability or inadmissibility and any other issues that may require disposition by the immigration judge." Thus, here, the DHS attorney had an obligation, yet completely failed, to alert the immigration judge to Ordoñez's mental health. *See M–A–M–,* 25 I. & N. Dec. at 480; 8 C.F.R. § 1240.2(a); *see also Lopez-Collazo*, 824 F.3d at 462 (noting that the regulations required DHS to provide the Notice of Intent to the defendant in his native language or explain its contents to him in his native language and DHS failed to do so, and that "[t]he government allow[ed] that DHS's failure to adhere to its own regulations was a violation of due process that enabled Lopez-Collazo to establish the first prong of § 1326(d)'s fundamental unfairness requirement").

Certainly, a mental health diagnosis or a history of mental health symptoms does not, in and of itself, establish incompetence at the time of the removal proceedings. *See Diop*, 807 F.3d at 76 ("Mental competency is not a static condition'; what matters is respondent's mental state at the time of the removal proceedings. . . . While past mental history can certainly bear on competency, it is by no means dispositive." (quoting *M–A–M–*, 25 I. & N. Dec. at 480)). But, neither can it be ignored when, as here, it is clearly documented in the records of DHS. Further, "competence" for purposes of removal proceedings is a term of art, and "a diagnosis of mental illness does not automatically equate to a lack of competency." *M–A–M–*, 25 I. & N. Dec. at 480 ("[W]e also recognize that there are many types of mental illness that, even though serious, would not prevent a respondent from meaningfully participating in immigration proceedings."). The immigration judge is not considering the alien's mental health specifically, but rather whether he "has a rational and factual understanding of the nature and object of the proceedings," and is able to consult with anyone who is assisting him and "to examine and present evidence and cross-examine witnesses." *Id.* at 75 (quoting *M–A–M–*, 25 I. & N. Dec. at 479).

Here, the record before the immigration court was replete with clear indicia of Ordoñez's struggles with his mental health—in the presentence report, his U visa application, records from detention facilities, and other documents. For example, he contemplated suicide while living on the streets as a teenager, and he attempted suicide twice before his first deportation. When he returned to the United States in 2009, his mental health needs were rated "severe" in his admission assessment, and psychiatric care was recommended. While detained, he was on suicide watch, reported that he heard voices, and sought mental health assistance. In short, there were multiple entries in Ordoñez's immigration records that clearly documented the fact that he

had demonstrated serious mental health symptoms for a long time. This information was available to the immigration judge, and counsel for the DHS had an obligation to present it to the judge. Counsel's failure to do so was a troubling violation of this independent obligation. *See M–A–M–*, 25 I. & N. Dec. at 480; 8 C.F.R. § 1240.2(a).

Moreover, Ordoñez himself informed the immigration judge in his February 28, 2012 hearing that "being incarcerated [wa]s not doing [his] brain any good," Feb. 28, 2012 Hr'g Tr. 7:23–25, and that he could not "think straight," *id.* at 17:9–12. He testified: "I don't want to be incarcerated [any] more. . . . I wish it wasn't this way . . . . I don't [have] the funds to fight it anymore and the will, the power, . . . the strain, mentality." *Id.* at 32:23–33:15. Additionally, Ordoñez told the immigration judge that he would prefer deportation to Honduras—a country where, according to Ordoñez, he had been harassed, robbed, and physically assaulted repeatedly by the police—and a ten-year ban on reentry to three additional months of incarceration. *Id.* at 8:1–3, 18–19, 22. Even after the immigration judge advised Ordoñez repeatedly that "the safer way" was "to go to the merits" of his asylum application, *id.* at 16:7–10, 17:9–12, 19:16–20, 20:1–4, Ordoñez still chose to be deported, *id.* at 19:24–23:7. Simply put, his testimony demonstrated that he was giving up, rather than rationally weighing his options. Thus, there were sufficient indicia of incompetency to rebut the presumption of competence, and the immigration judge should have inquired into Ordoñez's competence, as the only reasonable conclusion on the evidence before the immigration court was that Ordoñez was not competent and lacked "a rational and factual understanding of the nature and object of the proceedings." *M–A–M–*, 25 I. & N. Dec. at 479; *see also Diop*, 807 F.3d at 75. As a result, Ordoñez could not meaningfully participate in his removal proceedings, and it was a violation of his due process rights to order his deportation under these circumstances. *See Diop*, 807 F.3d at 75.

Immigration judges also "have a duty to develop the administrative record." *United States v. Copeland*, 376 F.3d 61, 71 (2d Cir. 2004). In light of this requirement and the fact that "many aliens are uncounselled, our removal system relies on IJs to explain the law *accurately* to *pro se* aliens. Otherwise, such aliens would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal." *Id.* (emphasis added). For example, as noted, the immigration judge must "inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in [Chapter V of Title 8 of the Code of Federal Regulations]," which include asylum, and "afford the alien an opportunity to make application during the hearing, in accordance with the provisions of § 1240.8(d)." 8 C.F.R. § 1240.11(a)(2), (b).

Here, Ordoñez was aware of his ability to apply for asylum; he already had submitted an application. And, at the February 28, 2012 hearing, the immigration judge advised him at length about asylum, voluntary departure, and deportation, as well as their benefits and ramifications. But, when Ordoñez asked the immigration judge about how asylum hearings work, the following exchange occurred:

> [ORDOÑEZ]: You need evidence to prove that; right? That is going to --
> THE COURT: Not me. You. You need evidence.
> [ORDOÑEZ]: Right. I mean -- of course, I would need evidence to prove that; right?
> THE COURT: Correct.
> [ORDOÑEZ]: See, I don't have any evidence.
>
> THE COURT: All right. So you understand you are withdrawing it then?

Feb. 28, 2012 Hr'g Tr. 27:13–21. Significantly, the immigration judge did not explain that Ordoñez's own testimony could serve as sufficient evidence. This omission is tantamount to an

error of law, as it conveyed to Ordoñez that he could not obtain asylum because he did not "have any evidence."

As noted, an error of law typically does "not rise to the level of a due process violation." *United States v. Lopez-Collazo*, 824 F.3d 453, 467 (4th Cir. 2016) (quoting *United States v. Torres*, 383 F.3d 92, 104 (3d Cir. 2004)), *cert. denied*, 137 S. Ct. 628 (2017). But, under these circumstances, erroneously leading Ordoñez to believe that he could not succeed on his asylum application because he had no evidence, when, indeed, he could have offered evidence in the form of his own testimony, deprived him of "the opportunity to develop the issue" and consequently violated due process. *See United States v. Angulo-Galaviz*, No. 17CR3671-CAB, 2018 WL 1942367, at *7 (S.D. Cal. Apr. 25, 2018); *see also Lopez-Collazo*, 824 F.3d at 467; *United States v. Miranda-Rivera*, 206 F. Supp. 3d 1066, 1070–71 (D. Md. 2016). Further, informing Ordoñez that he could seek legal advice to confirm that the immigration judge was correct did not cure the error, given that Ordoñez had made clear that he lacked the funds for an attorney and that he therefore was relying on the judge to answer his questions (without misleading him).[7]

---

[7] The immigration judge also erred during the February 28, 2012 hearing when he told Ordoñez, who no longer had counsel, that he was ineligible for voluntary departure by operation of INA § 241(a)(5) (codified at 8 U.S.C. § 1231). Feb. 28, 2012 Hr'g Tr. 11:14–12:12, 20:18–20. Section 1231 (INA § 241(a)(5)) provides that an alien who has been previously deported or who has been granted a voluntary departure is ineligible for voluntary departure if he or she returns to the United States illegally. 8 U.S.C. § 1231. Yet, at that time, DHS had initiated new immigration proceedings under INA § 240 (8 U.S.C. § 1229a), which does not include the same restriction as 8 U.S.C. § 1231. Thus, the limitation in INA § 241(a)(5) (8 U.S.C. § 1231) was not applicable. Accordingly, the immigration judge erred in telling Ordoñez that he was ineligible for voluntary departure. *See* Gov't Supp. 5 (conceding that "Judge Yamaguchi in 2012 appears to have erroneously advised Mr. Ordoñez that INA § 241(a)(5) rendered him ineligible for voluntary departure when in fact § 241(a)(5) governs cases where [DHS] has reinstated a prior removal order rather than reinitiating proceedings as [DHS] did here").

*Actual Prejudice*

Despite the considerable time that the California immigration judge spent advising Ordoñez, two due process rights violations occurred. First, the immigration judge proceeded with the February 28, 2012 deportation hearing notwithstanding clear indicia that Ordoñez lacked competence. Second, the immigration judge told him that he needed evidence to obtain asylum and did not correct Ordoñez when he stated that he did not have evidence, even though Ordoñez of course had the ability to testify on his own behalf. As noted, a due process violation

---

But, this error did not cause prejudice—and consequently there was no fundamental unfairness from it—because Ordoñez was ineligible for voluntary departure due to his 2012 California aggravated felony conviction for receipt of stolen property. *See* 8 U.S.C. § 1229c(a)(1) ("The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 1229a of this title or prior to the completion of such proceedings, if the alien is not deportable under section 1227(a)(2)(A)(iii) [alien convicted of an aggravated felony] . . . ."). Ordoñez insists that his 2012 California convictions "were not final at the time of the 2012 removal hearing because they were still on appeal." Def.'s Supp. Reply 3–4. It is true that his 2012 conviction was on appeal at the time of his removal proceedings, and Immigration Judge Yamaguchi noted that DHS was "not arguing that [Ordoñez's] California conviction [was] a ground for [his] deportation," such that Ordoñez's appeal of that conviction was immaterial. Feb. 15, 2012 Hr'g Tr. 6:2–5.

Yet, under Ninth Circuit law, for immigration purposes, "a 'conviction' . . . exists once the district court enters judgment, notwithstanding the availability of an appeal as of right." *Planes v. Holder*, 652 F.3d 991, 995 (9th Cir. 2011) (departing from its holding prior to "the enactment of a statutory definition for 'conviction' in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996" that "a conviction need[ed] to attain 'finality' in order 'to support an order of deportation' under the INA"). Thus, an alien has a "conviction" for immigration purposes if "the trial court enter[ed] a formal judgment of guilt"; there is not "any requirement that all direct appeals be exhausted or waived." *Id.* at 996. The *Planes* Court noted that the Second, Fifth, Seventh, and Tenth Circuits agreed. *Id. But see Mohamed v. Sessions*, 727 F. App'x 32, 34 (2d Cir. 2018) (noting that, while the Second Circuit "has *suggested* that the definition of the word 'conviction,' added to the immigration laws in 1996, 'eliminate[d] the requirement that all direct appeals be exhausted or waived before a conviction is considered final" for immigration purposes, "the question remains open" (citation omitted)). *Contra United States v. Contant*, No. 18-1268, 2018 WL 3063961, at *1 (3d Cir. June 20, 2018) (noting that, in *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014), the Third Circuit "held that a conviction that provides the basis for removal is not 'final' for immigration purposes until direct appellate review has been exhausted or waived"). Thus, the California conviction rendered him ineligible for voluntary departure. *See Planes*, 652 F.3d at 995–96.

alone does not support dismissal of an indictment, however; there also must be a showing of prejudice. *United States v. Lopez-Collazo*, 824 F.3d 453, 460 (4th Cir. 2016). Thus, I must consider whether, if the California immigration judge had recognized Ordoñez's incompetence and informed Ordoñez that he could use his own testimony as evidence in support of asylum, "there was reasonable probability that he [would have obtained that relief and he] would not have been deported." *El Shami*, 434 F.3d at 665.

The clear answer is yes. It is true that Ordoñez stated clearly that he did not want to be incarcerated for three more months, waiting for an asylum hearing. But, that was when he thought (based on the immigration judge's erroneous statement) that he could appeal the deportation order, making that option less risky, and then again when he thought (based on another erroneous statement by the judge) that he could not succeed on his asylum application, making that option appear futile. Moreover, previously, with counsel, Ordoñez filed his asylum application and his U visa application, as well as two appeals of unfavorable decisions. Thus, it is reasonably probable that, with counsel, Ordoñez would have continued to pursue asylum instead of acquiescing to deportation. Moreover, given his history, particularly his mistreatment when he returned to Honduras, he had a reasonable likelihood of success. Indeed, the immigration judge repeatedly encouraged him to pursue asylum instead of accepting deportation, referring to an asylum hearing as "the safer way" to proceed. Feb. 28, 2012 Hr'g Tr. 16:7–10, 17:9–12.

Significantly, this case is like other cases in which the courts found prejudice from a due process violation in immigration proceedings. For example, Ordoñez, like Itehua, "had a reasonable probability to receive relief," but the due process violations prohibited him. *See Itehua*, 2018 WL 1470250, at *4. And, in *Anim v. Mukasey*, 535 F.3d 243 (4th Cir. 2008), the

immigration judge had denied an application for asylum and other relief from a Cameroonian citizen, "relying mainly on a letter authored by a U.S. Department of State official that reported, based on an overseas investigation" that the Cameroonian summonses to appear that Anim submitted to the immigration court were fraudulent. *Id.* at 248. The Fourth Circuit concluded that "the IJ's reliance on the letter, which lacks any meaningful indicia of reliability, violated her right to due process." *Id.*; *see id.* at 256. And, it concluded that the violation caused prejudice "[b]ecause the IJ's decision to deny relief turned on his finding that Anim submitted fraudulent documents, and this finding cannot be sustained without reliance on the . . . letter." *Id.* at 258. Here, similarly, the immigration judge's decision to deport Ordoñez resulted from his withdrawal of his asylum application, which it is reasonably probable he would not have withdrawn absent the due process violations. This caused prejudice, not least because it led him to abandon the one avenue of relief that the immigration judge himself thought was his best option. *See* Feb. 28, 2012 Hr'g Tr. 16:7–10, 17:9–12.

In *El Shami*, 434 F.3d 659, El Shami did not receive written notice of his deportation hearing, and the Fourth Circuit concluded that the INS had "deprived him of due process." *Id.* at 664. To determine whether this due process violation caused prejudice, the court considered whether El Shami would have been entitled to relief from deportation under an INA provision that "authorized an immigration judge to waive deportation upon a showing that certain mitigating factors outweighed adverse factors." *Id.* at 665. The court concluded that "El Shami had made such a showing" and, consequently, shown prejudice. *Id.* at 665–66. Here, the record shows that it was reasonably probable that Ordoñez would have been entitled to asylum and succeeded in his application if the immigration judge's due process violations had not kept him from pursuing it.

Further, Ordoñez's circumstances are unlike cases in which the courts did not find prejudice. For instance, in *Lopez-Collazo*, 824 F.3d 453, the failure to translate Lopez-Collazo's charges and the explanation of his rights into Spanish was a due process violation, but there was no prejudice because, even if the documents had been translated, Lopez-Collazo had an assault conviction that qualified (at least pre-*Dimaya*) as a crime of violence and "an 'aggravated felony' under the INA," such that he was "ineligible for discretionary forms of relief such as voluntary departure." *Id.* at 462, 465–66. The Fourth Circuit concluded:

> Accordingly, Lopez–Collazo cannot show that "there was a reasonable probability that he would not have been deported." *El Shami*, 434 F.3d at 665. Since Lopez–Collazo's ability to demonstrate prejudice hinges on his eligibility for voluntary departure in 2007, *see Ortiz–Lopez*, 385 F.3d at 1204 n.1; 8 U.S.C. § 1326(a)(1) (applying to aliens who reenter after having been previously removed or after having departed while a removal order was outstanding), his case for "fundamental unfairness" collapses "[b]ecause his deportation was a foregone conclusion" at that time, *Garcia–Martinez*, 228 F.3d at 963;

*Id. at* 465–66. In contrast, Ordoñez's departure was not "a foregone conclusion" because, even if his 2012 conviction barred his eligibility for voluntary departure, he remained eligible for asylum. *See id.* Thus, Ordoñez has shown prejudice and, consequently, demonstrated fundamental unfairness. *See id.* at 460.

## *Exhaustion and Judicial Review*

As discussed previously, a defendant seeking dismissal of an indictment based on the unlawfulness of the underlying deportation order must not only show fundamental unfairness in the entry of the order but also that he exhausted any available administrative remedies regarding the order, and that he was improperly deprived of the opportunity for judicial review at his deportation proceedings. 8 U.S.C. § 1326(d). At the February 28, 2012 hearing, Ordoñez abandoned his asylum claim and, significantly, gave up his right to appeal. Feb. 28, 2012 Hr'g Tr. 25:24–26:17. And in any event, because the California immigration judge did not explain to

Ordoñez that he himself could provide evidence to support his asylum application, he did not understand that he had been misinformed or that he had any basis for appeal, and therefore he "did not have the opportunity to seek judicial or administrative review." *See Itehua*, 2018 WL 1470250, at *3 (reaching same result). Thus, Ordoñez has established all requirements for the 2012 deportation order to be unlawful. It, therefore, cannot provide the basis for the Government's proof of the second element of illegal reentry.

Consequently, on this record, which includes Ordoñez's personal history and the history of his court proceedings, which unfortunately are individually and cumulatively disturbing and include many errors in the immigration courts in both Arizona and California, the Government cannot establish that Ordoñez was deported under a lawful deportation order. Ordoñez's Motion to Dismiss Indictment is granted. *See* 8 U.S.C. § 1326(d).

*Conclusion*

Through no fault of his own, Pedro Jose Ordoñez was brought to this country as a very young child by his mother. She subjected him to sustained serious mental and physical abuse— so much so that she was arrested, convicted and imprisoned for it. Ordoñez then lived with his father, who was somewhat less physically abusive, but otherwise indifferent to his care. When he returned to his mother following her jail sentence, she tossed him out into the streets to fend for himself at age fourteen. That he got into trouble in this situation should surprise no one. When accosted by his mother's adult boyfriend (and unable to stop him after trying to walk away three times), Ordoñez used a knife to defend himself and stabbed his attacker in the stomach. His bad luck continued. He was not charged by Arizona officials as a juvenile for this offense, but rather as an adult. While detained before and after his conviction for assault, his correctional records documented his serious mental health symptoms.

When Ordoñez was released following his short sentence for assault, ICE was waiting for him.  He was detained pending removal proceedings, and his mental health symptoms were observed and diagnosed (Schizoaffective Disorder). What followed were proceedings in Arizona before an immigration judge so fundamentally unfair that the Government wisely has not attempted to defend them.  Still a juvenile, Ordoñez was deported to Honduras, where he traded physical abuse by his parents for the same or worse by the police.

His efforts at age seventeen to return to the United States in 2009 failed, and he immediately was intercepted at the border.  Once again he found himself facing removal proceedings, this time in California.  His detention records show that his mental health symptoms had not abated—he was placed on suicide watch, and he sought treatment for hearing voices. His mental health needs were rated as "severe."

His second removal proceedings continued until February, 2012, when Ordoñez once more was deported.  At times, Ordoñez had *pro bono* counsel.  When he did, it made a difference.  His lawyers sought relief from removal on his behalf by filing an asylum claim, a claim under the Convention Against Torture, and an application for a U visa based on the abuse he had endured from his mother, whose conviction was obtained with Ordoñez's assistance.

But the funding for *pro bono* counsel did not last, and many times Ordoñez found himself in a battle of wits unarmed against DHS counsel intent on securing a "rock solid" deportation order, even at the expense of fulfilling their obligation to bring to the attention of the well-meaning, but at times misinformed, immigration judge Ordoñez's serious mental health problems.  The record is clear that Ordoñez tried his best when on his own, but he found himself in the shell-game like situation of trying to pick the best avenue of relief from involuntary deportation to pursue.  The immigration judge failed to develop the record by informing Ordoñez

that his own testimony could provide evidence in support of his asylum claim (which the judge viewed as the safest alternative to deportation for Ordoñez). Throughout the proceedings, Ordoñez made it clear that his mental health was such that he could not face the prospect of further incarceration, and that concern was driving his decision making. Yet the issue of his competency remained undisclosed by counsel for the DHS and unnoticed by the immigration judge. Believing himself unable to provide evidence to support his asylum claim (because of misinformation from the immigration judge), Ordoñez simply gave up. He consented to deportation and again was removed.

Looking at these particular facts through the lens of the legal requirements for Ordoñez to succeed in a collateral attack on the validity of the deportation orders, which the Government must establish to secure a conviction, those unfamiliar with the governing law might do a double take on learning that simply showing that both of his removal proceedings were fundamentally unfair is not enough. He must show prejudice as well, and I find that he has. For that reason, the indictment against him must be dismissed.

Undoubtedly, Ordoñez will face another round of deportation proceedings. The Government has every right and obligation to initiate them. But this time around, perhaps it will ensure that they are procedurally fair, the record is fully developed by the immigration judge, and counsel for DHS complies with his or her obligations with the professionalism and skill shown by counsel for the Government in the case before me. And, perhaps Ordoñez, too, will have counsel throughout, as this case shows just what a difference skilled, determined, and passionate advocates can make.

## **ORDER**

In sum, for the reasons stated above, Ordoñez's Motion, ECF No. 32, IS GRANTED.

Date:  August 31, 2018                                                      /S/
                                                        Paul W. Grimm
                                                        United States District Judge